IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

WILLIE M. BRIDGES                                                           PLAINTIFF

vs.                                    CIVIL NO. 05-1040

JO ANNE B. BARNHART,
COMMISSIONER, SOCIAL SECURITY ADMINISTRATION                                DEFENDANT

## MEMORANDUM OPINION

Willie Bridges (hereinafter "plaintiff"), brings this action pursuant to § 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of the Social Security Administration denying her applications for disability insurance benefits ("DIB"), and supplemental security income benefits ("SSI"), under Titles II and XVI of the Act.

## Background:

The applications for DIB and SSI now before this court were filed on May 18, 2000, alleging an onset date of May 3, 2000, due to a herniated disk in her lower back, chronic back pain, hypertension, obesity, and fluid retention. (Tr. 71, 82, 162). An administrative hearing was held on January 23, 2002. (Tr. 29). On March 5, 2002, an adverse decision was rendered. (Tr. 23). After the Appeals Council declined review, the case was appealed to this Court and, on October 30, 2003, remanded back to the Administrative Law Judge ("ALJ"), for reconsideration of the evidence concerning plaintiff's obesity and financial situation. (Tr. 216-222).

Plaintiff again filed concurrent applications for DIB and SSI on April 18, 2002, alleging an onset date of May 1, 2000, due to back problems and fluid retention. (Tr. 291-293, 320, 396-399).

Plaintiff was present and represented by counsel. A second administrative hearing was held on May 6, 2004, combining all of plaintiff's applications for benefits. (Tr. 402).

At the time of the second administrative hearing on May 6, 2004, plaintiff was fifty-eight years old and possessed a high school education. (Tr. 71, 100, 122, 407). Plaintiff also held a certificate as a nursing assistant. (Tr. 88). The record reveals that she had past relevant work ("PRW"), as a nurse's assistant, home health aide, security guard, convenience store clerk, poultry grader/inspector, and assembler. (Tr. 15, 118-125, 296).

On November 24, 2004, the ALJ found that plaintiff had severe impairments, including degenerative joint disease ("DJD"), of the knees, chronic lower back pain, hypertension, mild anemia, and obesity, but that those impairments did not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 192). After discrediting plaintiff's subjective allegations, the ALJ concluded that she maintained the residual functional capacity ("RFC"), to perform a wide range of sedentary work. With the assistance of a vocational expert ("VE"), she determined that plaintiff could still perform the positions of cashier/order clerk and charge account clerk. (Tr. 192).

On March 17, 2005, the Appeals Council declined to review this decision. (Tr. 174-176). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned by consent of the parties. The plaintiff and Commissioner have filed appeal briefs, and the case is now ready for decision. (Doc. # 7, 8).

**Evidence Presented:**

On June 28, 1995, plaintiff sought treatment for lower back pain that radiated down into her right gluteal region and right leg. (Tr. 133). Dr. Kenneth Prather noted moderate tenderness in her right lower lumbar region and right gluteal region that he assessed as degenerative disease of the lumbar spine with sciatic nerve involvement. He prescribed Naprosyn and advised plaintiff to place heat on her lower back and avoid strenuous activity. Although plaintiff continued to seek treatment from Dr. Prather, she did not again seek treatment for lower back pain until 2000. On May 5, 2000, plaintiff was seen for subjective complaints of lower back pain radiating into both thighs. (Tr. 126). She denied any recent or specific injury, although she claimed to have fallen approximately three years prior. (Tr. 126, 129). Plaintiff indicated that she was employed at a nursing home where she had to perform frequent lifting and positioning of patients. At the time of her appointment, plaintiff's blood pressure was 110/80. (Tr. 126). Dr. Prather's examination revealed tenderness across the lower lumbar region and SI joints. (Tr. 126). Both lumbar flexion and straight-leg raise testing produced discomfort. (Tr. 126). Deep tendon reflexes were positive and equal, and motor and sensory functions were intact in the lower extremities. (Tr. 126). Dr. Prather noted that plaintiff's lower back pain could be secondary to degenerative disc disease ("DDD"). He also diagnosed plaintiff with hypertension under good control. (Tr. 126). Dr. Prather then ordered an MRI and again instructed her to place heat on her lower back and avoid heavy lifting. (Tr. 126). The MRI revealed narrowing of the L4-5 disc space with omnidirectional disc bulging at that level causing a slight indentation of the thecal sac anteriorly, along with narrowing of the neural foramina,

AO72A
(Rev. 8/82)

bilaterally. (Tr. 127).

On May 17, 2000, plaintiff returned to see Dr. Prather with continued complaints of lower back pain. (Tr. 125). Plaintiff indicated that she continued to work at the nursing home, and felt that this had contributed to her difficulty. Dr. Prather noted tenderness across the lower lumbar region and over both SI joints. Further, the straight leg raise maneuver produced discomfort, as did flexion of the spine. After reviewing her MRI results, he diagnosed her with chronic lower back pain secondary to degenerative disk disease ("DDD"). (Tr. 125). For this, Dr. Prather prescribed Robaxin and Vicoprofen. Plaintiff was also instructed to place heat on her lower back and avoid heavy lifting or pulling. (Tr. 125). Dr. Prather advised plaintiff to consider undergoing an evaluation by a neurosurgeon for possible surgical intervention. (Tr. 125). Plaintiff advised Dr. Prather that she would contact the clinic in the near future with her decision. (Tr. 125). However, she never did so.

A treatment notation dated August 16, 2000, reveals that plaintiff returned to the clinic again complaining of radiating lower back pain. (Tr. 347). Dr. Prather's examination of plaintiff's bones, joints, and extremities revealed tenderness across the lower lumbar region. (Tr. 347). Lumbar flexion and straight leg raising tests produced discomfort. (Tr. 347). However, plaintiff's lower extremity motor and sensory functioning appeared to be intact. (Tr. 347). Dr. Prather diagnosed her with chronic lower back pain secondary to DDD. (Tr. 347). Plaintiff informed Dr. Prather that she was ready to be referred to a neurosurgeon and would contact the clinic "in the next few days" to arrange for an appointment. She was also given prescriptions for Robaxin and Vicoprofen. (Tr. 347).

From April 2001 until March 2004, plaintiff received treatment from the Interfaith Clinic, which is a charitable or reduced fee clinic. (Tr. 414). Treatment records reveal that plaintiff was seen at the clinic approximately twenty-two times for various aliments to include congestion, edema, mild anemia, DJD, and hypertension. (Tr. 260-64, 353-66, 388-93). During the initial visit on April 17, 2001, plaintiff reported experiencing some pain "most all of the time." (Tr. 156). The doctor noted a decreased range of motion in her lumbar spine in all directions, as well as a reflexive non-response in both knees. For this, she was prescribed Ibuprofen and another medication. (Tr. 156). In a follow-up examination on October 29, 2001, plaintiff indicated that her back pain had improved. (Tr. 359). Then, on May 22, 2001, she was prescribed a lumbosacral girdle. (Tr. 154).

On July 10, 2001, Interfaith Clinic records indicate that plaintiff's edema and back pain had decreased. (Tr. 150). As such, she was prescribed Vioxx and Ultram. (Tr. 150). On August 7, 2001, no change was noted in her condition. (Tr. 157). On September 25, 2001, the doctor recommended that she try using a back support. (Tr. 158). By October 29, 2001, however, she reported that her back pain had again improved. (Tr. 159). However, she continued to take Ultram, Vioxx, and Lasix. (Tr. 159). On January 22, 2002, plaintiff reported that her back pain was getting worse. (Tr. 172). She was prescribed physical therapy to include heat, ultrasound, and traction of the lumbar spine. Then, on February 26, 2002, plaintiff's condition was noted to have again improved. (Tr. 171). In fact, on March 26, 2002, plaintiff's doctor recommended that she seek assistance from a vocational rehabilitation program or Medicaid. (Tr. 170). It was noted that she needed an MRI and a referral to a neurosurgeon. (Tr. 170).

5

On July 24, 2002, plaintiff underwent a consultative physical examination.[1] (Tr. 379). Plaintiff complained of back, left hip, and ankle pain. (Tr. 379). She stated that her back pain started five years prior, after she fell down a flight of stairs and landed on her back. (Tr. 379). Plaintiff was noted to be 64 and ½ inches tall and weighed 294 pounds. (Tr. 381). Her blood pressure was 159/81. (Tr. 381). An examination of her cervical and lumbar spines revealed a normal range of motion with no evidence of muscle spasm. (Tr. 382). Further, her shoulders, elbows, wrists, hands, and knees demonstrated a normal passive range of motion. (Tr. 382-383). However, plaintiff's hips indicated reduced forward flexion, reduced internal rotation, and reduced external rotation on the left side. (Tr. 383). Her ankles demonstrated normal plantar flexion bilaterally, but reduced dorsi-flexion on the left side. (Tr. 383). The doctor did note that plaintiff's exam was limited due to her obesity. A neurological examination was generally characterized as grossly intact, although plaintiff complained of some numbness along her left outer thigh. (Tr. 381, 383). There was no evidence of muscle atrophy, sensory abnormality, or muscle weakness caused by "diffuse deconditioning." (Tr 383). As such, the doctor diagnosed plaintiff with possible osteoarthritis of the right hip and possible lumbar stenosis. (Tr. 385). Both an MRI and x-rays of the right hip and pelvis were recommended. (Tr. 385).

On November 21, 2003, plaintiff reported increased back pain with radiation into both lower extremities. (Tr. 388). For her pain, plaintiff was given an injection of Decadron and prescriptions for a Medrol dose pack, Robaxin, and Lortab. The doctor noted that her hypertension was under

---

[1] The name of the consultative examiner is not clear. (Tr. 386).

good control. (Tr. 388).

On February 16, 2004, Interfaith Clinic progress notes indicate that plaintiff was taking her medication as prescribed, and was experiencing no side effects. (Tr. 393). The doctor diagnosed her with DDD, hypertension, and fluid retention. Plaintiff was prescribed Lortab, Robaxin, and Amitriptyline. (Tr. 393).

A clinic notation from March 22, 2004, noted that plaintiff's hypertension was well controlled at 123/68. (Tr. 264). At this time, she was diagnosed with DJD of the lumbar spine and knees, as well as mild anemia. Her medications were said to include Lasix, Potassium Chloride, Amitriptyline, and Vioxx. The doctor advised her to exercise and take an iron supplement. (Tr. 264).

On August 16, 2004, plaintiff underwent a second Agency sponsored consultative physical examination with Dr. D'Orsay Bryant, an orthopaedic surgeon. (Tr. 265). Plaintiff complained of bilateral knee pain over the previous two years, as well as chronic lower back pain. She told Dr. Bryant that she injured her back in 1995 (as opposed to 1997), when she fell down a flight of stairs. Plaintiff denied any traumatic injury to her knees. A physical exam revealed a weight of 330 pounds, but no evidence of joint line tenderness with a painless reduced range of motion at 0–120 degrees (normal is 0–150) in her knees. (Tr. 265-66). Dr. Bryant stated that plaintiff's back was non-tender without spasm and demonstrated a full range of motion. The rest of the examination revealed normal range of motion in plaintiff's cervical and lumbar spines, shoulders, elbows, wrists, hands, hips, and ankles. (Tr. 266). X-rays were negative for fracture or acute bony injury. (Tr. 265). Thus, Dr.

7

Bryant diagnosed plaintiff with bilateral knee pain and chronic low back pain. He concluded that, despite her subjective complaints of difficulty lifting heavy objects, plaintiff could sit, stand, walk, hear, speak, travel, and handle objects. (Tr. 265).

Dr. Bryant also completed a medical assessment of ability to perform work related physical activities, wherein he found plaintiff capable of frequently lifting and/or carrying up to twenty pounds, occasionally lifting and/or carrying twenty to fifty pounds, and never lifting and/or carrying over fifty pounds. (Tr. 267). He noted no communicative or environmental limitations, and stated that plaintiff could frequently engage in simple grasping, fine manipulation, handling objects, feeling objects, and reaching. (Tr. 267). While plaintiff could frequently engage in pushing, pulling, and operating controls with her hands, she could only occasionally do these functions with her feet. (Tr. 267). Finally, Dr. Bryant concluded that plaintiff could occasionally climb, balance, stoop, crouch, and kneeling, but never crawl. (Tr. 267).

**Applicable Law:**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists

8

in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevent him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy

9

given her age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of her or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

**Discussion:**

We first address the ALJ's assessment of plaintiff's subjective complaints. The ALJ was required to consider all the evidence relating to plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. *Id*. As the United States Court of Appeals for the Eighth Circuit recently observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).

Plaintiff has alleged a variety of disabling impairments, including a herniated disk in her lower back, chronic back pain, hypertension, obesity, and fluid retention. (Tr. 71, 82, 162). At the onset, we note that the evidence does indicate that plaintiff has been diagnosed with hypertension. (Tr.126, 381, 388, 393). However, progress notes indicate that this condition has been brought under control via the use of medication. (Tr. 264, 388). *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir.

10

1995) (holding that a condition that can be controlled or remedied by treatment cannot serve as a basis for a finding of disability). As such, we cannot say that this condition is disabling.

Likewise, plaintiff's complaints of disabling fluid retention are not supported by the overall record. Again, she has been diagnosed with intermittent edema and prescribed Lasix. (Tr. 150, 260-64, 353-66, 388-93). However, the records indicate that her condition was responsive to this medication. (Tr. 150). *Id*.

As for plaintiff's back condition, we note that an MRI revealed narrowing of the L4-5 disc space with omnidirectional disc bulging at that level causing a slight indentation of the thecal sac anteriorly, along with narrowing of the neural foramina. (Tr. 127). Although her most recent physical examinations have revealed a normal range of motion in her cervical and lumbar spines, we do note that plaintiff has been diagnosed with DDD. (Tr. 125, 265, 382). For this, she was prescribed a variety of muscle relaxers and pain medications to include Robaxin, Vicoprofen, Vioxx, Lortab, and Ultracet. (Tr. 125, 156, 159, 264, 347, 388, 393). *See Black v. Apfel,* 143 F.3d 383, 386 (8th Cir. 1998) (holding that fact that claimant had not undergone surgery and relied on conservative treatment weighed against his subjective complaints); *Robinson v. Sullivan,* 956 F.2d 836, 840 (8th Cir. 1992) (noting the fact that all doctors who treated plaintiff prescribed conservative treatment did not support plaintiff's contention of disability). In fact, the records do indicate that plaintiff's condition was somewhat responsive to these medications, and that she suffered from no medication side effects. (Tr. 150, 159, 171). *See Roth*, 45 F.3d at 282. Further, while she was advised to undergo a neurosurgical evaluation, plaintiff failed to do so. *See Dunahoo v. Apfel*, 241 F.3d 1033,

11

1038 (8th Cir. 2001) (holding that claimant's failure to follow prescribed course of treatment weighed against credibility when assessing subjective complaints of pain). She contends that her non-compliance was excused by her financial situation. This assertion, however, is belied by the fact that the record contains no evidence to show that plaintiff ever sought financial assistance in obtaining a neurosurgical consultation. *Murphy v. Sullivan*, 953 F.3d 383, 386-87 (8th Cir. 1992) (holding that lack of evidence that plaintiff sought low-cost medical treatment from her doctor, clinics, or hospitals does not support plaintiff's contention of financial hardship). The evidence makes clear that plaintiff was aware of the existence of such services, as she was being treated by the Interfaith Clinic, a charitable clinic. (Tr. 260-264, 353-366, 388-393). Accordingly, we do not find her non-compliance to be excused by her financial state.

While we do note that the evidence reveals that plaintiff's condition was exacerbated due to her obesity, we can find no evidence to show that her obesity rendered her disabled. (Tr. 383). During the relevant period, plaintiff's weight fluctuated between 267 and 330 pounds, generally staying between 290-295 pounds.[2] (Tr. 265). While it is true that at the time of Dr. Bryant's

---

[2]Weight measurements during relevant period under consideration include: 267 pounds on May 5, 2000 (Tr. 126); 288 pounds on April 17, 2001 (Tr. 366); 295 pounds on May 1, 2001 (Tr. 365); 292 pounds on May 22, 2001 (Tr. 364); 298.5 pounds on June 11, 2001 (Tr. 363); 295 pounds on July 10, 2001 (Tr. 362); 295 pounds on August 7, 2001 (Tr. 361); 294 pounds on September 25, 2001 (Tr. 360); 295 pounds on October 29, 2001 (Tr. 359); 291 pounds on December 18, 2001 (Tr. 263, 358); 293.5 pounds on January 22, 2002 (Tr. 262, 357); 294 pounds on February 26, 2002 (Tr. 261, 356); 290 pounds on March 26, 2002 (Tr. 260, 355); 290 pounds on April 30, 2002 (Tr. 354); 291 pounds on June 10, 2002 (Tr. 353); 294 pounds on April 8, 2003 (Tr. 392); 293 pounds on May 6, 2003 (Tr. 391); 292 pounds on June 9, 2003 (Tr. 390); 284 pounds on August 17, 2003 (Tr. 389); 284, pounds on November 21, 2003 (Tr. 388); 298 pounds on February 16, 2004 (Tr. 393); 300 pounds on March 22, 2004 (Tr. 264); around 294 at the administrative hearing held on May 6, 2004 (Tr. 413); and 330 pounds on August 16, 2004. (Tr. 265).

12

consultative physical examination on August 16, 2004, she weighed a maximum of 330 pounds, he concluded that she could still perform functional activities such as sitting, standing, walking, hearing, speaking, traveling, and handling objects. (Tr. 265, 267). However, these limitations were taken into account by the ALJ when determining plaintiff's RFC.

Plaintiff's own reports concerning her activities of daily living also contradict her claim of disability. On her supplemental interview outline dated February 16, 2001, plaintiff admitted she could still care for her personal hygiene, do the laundry, wash dishes, change the sheets, iron, vacuum/sweep, take out the trash, dust, shop for groceries and clothes, go to the post office, prepare meals, pay bills, count change, drive, attend church, watch TV, listen to the radio, and read. (Tr. 107-108, 187, 310-11, 418-19). A second, undated outline reveals that plaintiff also retained the ability to visit friends and family. (Tr. 311). *See McGeorge v. Barnhart*, 321 F.3d 766, 768 (8th Cir. 2003)(holding that plaintiff was able to perform many of the activities associated with daily life); *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor). These activities are

inconsistent with claims of disabling pain and impairment.

Therefore, although it is clear that plaintiff suffers from some degree of pain, she has not established that she is unable to engage in any and all gainful activity. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability); *Woolf v. Shalala*, 3 F.3d at 1213 (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled). Neither the medical evidence nor the reports concerning her daily activities support plaintiff's contention of total disability. Accordingly, we conclude that substantial evidence supports the ALJ's conclusion that plaintiff's subjective complaints were not totally credible.

Plaintiff contends that the ALJ erred by failing to take into account her earnings' records, and the fact that she had to leave her position at ConAgra, a poultry processing plant, due to excessive standing, and the fact that she left her CNA job due to the lifting, bending, and standing requirements. The record does reveal that plaintiff's position at the poultry processing plant required her to stand six to twelve hours per shift, while her CNA job required lifting in excess of 100 pounds, with bending and standing up to seven hours per workday. (Tr. 302, 306-07). However, the ALJ found that plaintiff was limited to occasional lifting, bending, and standing, meaning up to 1/3 of the time. (Tr. 189). *See Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles*, at Appendix C-3 (Dept. Of Labor 1993) (occasionally defined as occurring up to 1/3 of the time, and frequently defined as occurring from 1/3 to 2/3 of the time). Further, the ALJ found she could not perform any of her PRW due to the requirement for repetitive lifting greater than twenty pounds, as well as the repetitive and frequent bending, stooping, and kneeling required. (Tr.

14

190). Therefore, the fact that the plaintiff left both jobs because they exceeded her ability to lift, bend, and stand is consistent with the ALJ's findings. (Tr. 189, 190).

Plaintiff also contends that the ALJ erred in finding that she maintained the RFC to perform a wide range of sedentary work. It is well settled that the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000). The United States Court of Appeals for the Eighth Circuit has also stated that a "claimant's residual functional capacity is a medical question," *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000), and thus, "some medical evidence," *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam ), must support the determination of the plaintiff's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." *Nevland v. Apfel*, 2 04 F.3d 853, 858 (8th Cir. 2000). Therefore, in evaluating the plaintiff's RFC, *see* 20 C.F.R. § 404.1545(c), while not limited to considering medical evidence, an ALJ is required to consider at least some supporting evidence from a professional. *Cf. Nevland v. Apfel*, 204 F.3d at 858; *Ford v. Secretary of Health and Human Servs.*, 662 F. Supp. 954, 955, 956 (W.D. Ark. 1987) (RFC was "medical question,"and medical evidence was required to establish how claimant's heart attacks affected his RFC).

In the present case, the ALJ considered the medical assessments of non-examining agency medical consultants, consultative examinations, plaintiff's subjective complaints, and her medical records. On August 23, 2000, Dr. Alice Davidson, a non-examining, consultative physician, completed an RFC assessment. (Tr. 134-141). After reviewing the medical records, she concluded that plaintiff could lift twenty-five pounds frequently and fifty pounds occasionally, as well as sit,

15

stand, and walk for six hours during an eight-hour workday. (Tr. 135). Further, she found that plaintiff was limited to occasional stooping and crouching. (Tr. 136).

On April 2, 2001, Dr. William Payne, another non-examining, consultative physician completed an RFC assessment. (Tr. 142-149). After reviewing plaintiff's medical records, he also concluded that she could lift twenty-five pounds frequently and fifty pounds occasionally, as well as sit, stand, and walk for about six hours during an eight-hour workday. (Tr. 143). In addition, Dr. Payne concluded that plaintiff was limited to occasional stooping and crouching. (Tr. 144).

On August 1, 2002, Dr. Ronald Crow, a non-examining, consultative physician, completed an RFC assessment. (Tr. 369-378). After reviewing plaintiff's medical records, he concluded that plaintiff could lift less than ten pounds frequently and ten pounds occasionally, stand and walk at least two hours during an eight-hour workday, and sit about six hours during an eight-hour workday. (Tr. 370).

As discussed above, the medical evidence does not indicate that plaintiff was suffering from any limitations that would prevent her from performing sedentary work. We note that Dr. Bryant, a consultative examiner, concluded that plaintiff could lift up to twenty pounds frequently; occasionally push, pull, and operate controls with her feet; occasionally climb, balance, stoop, and kneel; and, never crawl. (Tr. 267). As such, we believe the record contains substantial evidence to support the ALJ's conclusion that plaintiff could perform a wide range of sedentary work.

We also find that substantial evidence supports the ALJ's finding that plaintiff could perform work as a cashier/order clerk and charge account clerk. (Tr. 192). The ALJ presented the VE with

16

a hypothetical example of an individual of plaintiff's age and education who had back pain, DDD, a disk bulge at the L4-5 levels, a slight indentation at the degual sac, and obesity, resulting in the ability to lift ten pounds frequently and twenty pounds occasionally, sit up to six hours during an eight-hour workday, stand and walk no more than two to four hours during an eight-hour workday, and occasionally climb, balance, stoop, crouch, kneel, and crawl. (Tr. 425-426). The VE testified that such a person could perform the positions of cashier/order clerk and charge account clerk. (Tr. 426). The VE also testified that these jobs would remain available to plaintiff if she required a sit/stand option. (Tr. 426). As this hypothetical question took into consideration the limitations the ALJ concluded were actually caused by plaintiff's impairments, and which are supported by substantial evidence, the VE's testimony provided substantial evidence to support the ALJ's finding that plaintiff could perform the positions of cashier/order clerk and charge account clerk. *See Depover v. Barnhart,* 349 F.3d 563, 568 (8th Cir. 2003) (holding that a VE's response to a properly posed hypothetical question supplied substantial evidence to support ALJ's finding that plaintiff could return to PRW).

**Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision should be affirmed. The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

DATED this 14th day of June 2006.

/s/ Bobby E. Shepherd
HONORABLE BOBBY E. SHEPHERD
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)